

**This opinion was filed for record**
at 8a.m. on Jan 16, 2020

Ōusan Ō. Carl
**Susan L. Carlson**
**Supreme Court Clerk**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LOWE'S HOME CENTERS, LLC, | ) | No. 96383-5 |
| Petitioner, | ) ) ) | |
| v. | ) ) | En Banc |
| DEPARTMENT OF REVENUE, STATE OF WASHINGTON, | ) ) ) ) | |
| Respondent. | ) ) ) | Filed __JAN 16 2020__ |

MADSEN, J.—This case concerns whether a retail seller, Lowe's Home Centers, may seek reimbursement of state sales taxes and B&O (business and occupation) taxes from the Department of Revenue (DOR) where Lowe's contracted with GE Capital Financial Incorporated and Monogram Credit Bank of Georgia (banks) to offer private label credit cards to its customers, and agreed to repay the banks for losses they sustained on defaulting customer accounts. RCW 82.08.050 provides that a seller must collect and remit sales taxes to the State. For sellers unable to recoup sales tax funds from buyers, RCW 82.08.037(1) provides that sellers may claim a deduction "for sales taxes

previously paid on bad debts, as that term is used in 26 U.S.C. Sec. 166." In a partially split decision, the Court of Appeals affirmed the trial court's denial of reimbursement.

We hold that although the banks were involved in the credit transaction, Lowe's is still the seller burdened with the loss from its customers' defaults, including their nonpayment of the sales taxes. Accordingly, we reverse the Court of Appeals.

## FACTS

Lowe's contracted with two banks to offer private label credit cards to Washington customers. The banks offered credit to cardholders who purchased Lowe's goods. Within two days of a credit purchase, the banks would send full payment and related sales taxes to Lowe's. Lowe's then remitted the taxes to DOR.

The banks undertook the majority of the risk of defaulting cardholders, and Lowe's contracted to mitigate this risk by acting as guarantor. When credit card holders failed to repay the purchase price and sales tax, Lowe's agreed to reimburse the banks. The contract calculated Lowe's share of the banks' finance income by providing that Lowe's "shall be responsible for Net Write-Offs during such year up to a maximum of 7.0% of Average Net Receivables." Clerk's Papers (CP) at 140. The contract termed these repayments "bad debt guarantees" and stated that Lowe's alone could claim bad debt relief. *E.g.*, *id.* at 454.[1] Each month the banks subtracted amounts it had written off as uncollectible (up to the 7.0 percent cap) from the amounts it could collect from cardholders.

---

[1] The agreements specified that Lowe's and "not [the] Bank[s] shall have the right to claim any available sales tax deductions related to Net Write-Offs borne by" Lowe's. CP at 454, 523, 613.

On its federal income tax returns, Lowe's claimed bad debt reductions based on its bank repayments. For its 2001-2009 state tax assessment period, Lowe's asked for the same deduction. Lowe's sought a refund of over $2.2 million. DOR denied the refund. After paying its tax assessment under protest, Lowe's appealed and sought reimbursement in superior court.

On cross motions for summary judgment, the trial court agreed with DOR that Lowe's should not receive a sales tax deduction and dismissed the case. The Court of Appeals affirmed in a published split opinion. *Lowe's Home Ctrs., LLC v. Dep't of Revenue*, 5 Wn. App. 2d 211, 242-43, 425 P.3d 959 (2018); *id.* at 243 (Maxa, J., dissenting).

Two amici submitted briefing. Kohl's Department Stores Inc. and the Council on State Taxation (COST) filed briefs in support of Lowe's petition for review; COST also filed a brief in support of Lowe's supplemental briefing.[2]

## ANALYSIS

At issue is whether Lowe's is entitled to a refund of sales and B&O taxes because the banks reduced Lowe's profit share from credit card transactions to meet Lowe's obligation as guarantor of the banks' bad debt arising from the banks' contract with Lowe's account holders.

---

[2] Kohl's notes that its own litigation concerning bad debt relief in Thurston County has been consolidated with a case from Macy's, and the matter has been stayed pending our resolution of this case.

3

DOR urges us to deny the reimbursement. The plain language of our state bad debt provisions requires a taxpayer to satisfy four requirements: (1) be a seller (2) making sales at retail and (3) entitled to a refund for sales taxes previously paid on bad debts (4) that are federally deductible. RCW 82.08.037(1); *see also* WAC 458-20-196(3)(a). DOR argues that Lowe's fails to satisfy the plain language of .037(1) because Lowe's fully recovered sales tax funds and incurred no bad debt.

Lowe's counters that state bad debt relief relies exclusively on federal bad debt relief. Because Lowe's received a federal deduction, Lowe's contends that it qualifies for a state deduction. Lowe's further contends that its contractual payments to the banks covering the banks' losses qualify as "sales taxes previously paid" under .037(1).

Standard of Review

We review summary judgment orders de novo. *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 796-97, 123 P.3d 88 (2005). Taxes are presumed to be valid, and the burden is on the taxpayer to prove the tax is incorrect. *Avnet, Inc. v. Dep't of Revenue*, 187 Wn.2d 44, 49-50, 384 P.3d 571 (2016) (plurality opinion) (citing *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 43, 246 P.3d 788 (2011)); *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). The taxpayer seeking a refund has the burden to prove that DOR incorrectly assessed the tax and that it is entitled to a refund. RCW 82.32.180. We look to substance rather than form when determining tax classifications. *First Am. Title Ins. Co. v. Dep't of Revenue*, 144 Wn.2d 300, 303, 27 P.3d 604 (2001). To qualify for a tax exemption, a taxpayer must

demonstrate that the exemption clearly falls within the scope of a tax deduction statute. *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 196-97, 242 P.3d 810 (2010). If ambiguity exists in an exception or deduction provision, courts strictly construe the provision against the taxpayer. *Avnet*, 187 Wn.2d at 50 (citing *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 149-50, 3 P.3d 741 (2000)).

Lowe's and DOR agreed before the Court of Appeals and reaffirmed here that there are no issues of material fact. *Lowe's*, 5 Wn. App. 2d at 223. We must decide whether, as a matter of law, Lowe's is entitled to a sales tax refund under RCW 82.08.037.

Sales Tax

Washington imposes sales tax on retail purchases. RCW 82.08.020. A buyer must pay sales tax to the seller, and the seller must remit the tax to DOR, even if the seller does not collect that tax at the point of sale. *White v. State*, 49 Wn.2d 716, 724-25, 306 P.2d 230 (1957) (sellers must remit the tax whether or not they collect it); *AARO Med. Supplies, Inc. v. Dep't of Revenue*, 132 Wn. App. 709, 716, 132 P.3d 1143 (2006). "The amount of tax, until paid by the buyer to the seller or to the department, constitutes a debt from the buyer to the seller." RCW 82.08.050(8).

Under Washington law, a seller who collects sales tax from a buyer over time must hold those funds in trust and must remit them to DOR. RCW 82.08.050(2)-(3). A seller cannot use sales tax funds for other purposes; if a seller fails to remit the funds for any reason, the seller is personally liable. *Id.* A seller making a credit sale to a customer

who later defaults in payment will have remitted sales tax to the State that it could not collect from a customer. *E.g.*, *Puget Sound Nat'l Bank v. Dep't of Revenue*, 123 Wn.2d 284, 287, 868 P.2d 127 (1994); James A. Amdur, Annotation, *Recovery of Sales Taxes Paid on Bad Debts*, 38 A.L.R.6th 255, § 2 (2008).

The former sales tax and B&O tax administrative rule reiterated that under RCW 82.08.037 and RCW 82.04.4284, sellers are entitled to a credit, refund, or deduction for sales or B&O taxes previously paid on "bad debts" under section 166 of the Internal Revenue Code, and the former rule further provided that taxpayers "may claim the credit or refund for the tax reporting period in which the bad debt is written off as uncollectible in the taxpayer's books and records and would be eligible for a bad debt deduction for federal income tax purposes." Former WAC 458-20-196(2)(a), (3)(a) (2005).[3] The policy behind this statute is to "provide relief to vendors" left holding uncollectible sales tax. *Home Depot USA, Inc. v. Dep't of Revenue*, 151 Wn. App. 909, 917, 215 P.3d 222 (2009) (citing Amdur, *supra*).

As noted, RCW 82.08.037(1) has four requirements: a taxpayer must (1) be a seller (2) making sales at retail and (3) entitled to a refund for sales taxes previously paid on bad debt (4) that is federally deductible.[4] Lowe's and DOR do not dispute that

---

[3] DOR amended WAC 458-20-196 in 2010 with no change to the relevant language. But, effective July 29, 2018, DOR again amended the rule, deleting the reference in former WAC 458-20-196(2)(a) to claiming a refund "for the tax reporting period in which the bad debt is written off as uncollectible in the taxpayer's books and records." *See* WAC 458-20-196(2) (effective July 2018). The parties do not address this amendment made after the assessment period.

[4] In 2003, the legislature altered the text of .037(1) as follows: "A seller is entitled to a credit or refund for sales taxes previously paid on debts which are ((deductible as worthless for federal

6

Lowe's has satisfied requirements one, two, and four. The parties' dispute involves the *meaning* of requirement four, as well as whether it satisfies requirement three. Lowe's asserts, "Washington look[s] exclusively to federal law and standards relating to bad debt losses" to determine state deductions. Pet. for Review at 12. Therefore, they assert a federal deduction automatically meets state requirements.

Federal Bad Debt Deduction

26 U.S.C. § 166(a)(1) allows as a deduction "any debt which becomes worthless within the taxable year." It permits a deduction for "bad debts owed to the taxpayer" and states that for this purpose, bad debt shall be taken into account as a deduction for debts that become worthless. 26 C.F.R. § 1.166-1(a). Only a bona fide debt arising from a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed sum of money qualifies. 26 C.F.R. § 1.166-1(c).

If a taxpayer agrees in the course of business to act as a *guarantor* of a debt obligation and makes a payment of principal or interest in discharge of that obligation as a guarantor, that payment is "treated as a business debt becoming worthless in the taxable year in which the payment is made." 26 C.F.R. § 1.166-9(a). A taxpayer's payment discharging its agreement to act as a guarantor of an obligation will be treated as worthless debt if the agreement was entered into in the course of the taxpayer's trade or

income tax purposes)) bad debts under 26 U.S.C. Sec. 166, as amended or renumbered as of January 1, 2003." LAWS OF 2003, ch. 168, § 212 (underlined text was added to the session law and language in double parentheses was deleted). The 2003 language was in effect during Lowe's sales tax assessment period for which it seeks reimbursement (2001-2009). The 2003 language change did not materially affect the federal deductibility requirement under .037(1). The parties do not disagree.

7

business or transaction for profit, the taxpayer was subject to an enforceable legal duty to make the payment, and the agreement was entered into before the obligation became worthless. 26 C.F.R. § 1.166-9(d).

Relevant Cases

To resolve this case, the parties refer us primarily to two tax refund cases: *Puget Sound National Bank*, 123 Wn.2d 284, and *Home Depot USA*, 151 Wn. App. 909. In *Puget Sound National Bank*, car dealers entered into installment contracts with buyers. When the dealers and buyers entered into the contracts, the dealers had to pay DOR the sales tax due on the purchase price of the car. *Puget Sound Nat'l Bank*, 123 Wn.2d at 285. When Puget Sound National Bank (PSNB) purchased the installment contracts from the dealers, it paid the dealers the balance due on the installment contracts, including the uncollected portion of sales tax, and the dealers assigned to the bank all their rights in the installment contracts. In that case, after assignment, buyers defaulted on their payments, and PSNB repossessed the cars, selling them at a loss and writing off the loss as worthless debt for federal tax purposes. *Id.* at 286. PSNB unsuccessfully petitioned DOR for a tax refund on the income tax loss as the assignee of the installment sales contracts under RCW 82.08.037. The sales tax refund statute, RCW 82.08.037, permitted a refund if the seller was (1) a person (2) making sales at retail and (3) was entitled to a refund for sales taxes previously paid on debts that are deductible as worthless for federal income tax purposes. *Id.* at 286-87. This court affirmed that a "seller" is every person making sales at retail or retail sales to a buyer or consumer and that a "person" includes

8

an assignee. *Id.* at 287. It determined that PSNB, as assignee, was a person and took a worthless debt deduction for federal income tax purposes relating to the installment contract. *Id.* Further, although the dealer and not PSNB made the retail sales, the court observed that no statute or public policy prohibited the assignment of a sales tax refund. *Id.* at 288-91. The court held that an assignment carries with it the rights and liabilities of the assigned contract and applicable statutory rights and liabilities, so when the dealers assigned the installment contracts to PSNB, the bank assumed all the dealers' rights and liabilities related to the contracts. *Id.* at 293. Consequently, under RCW 82.08.037, the status of PSNB included the dealers' tax attribute of "making sales at retail," and PSNB, as assignee, was entitled to a sales tax refund. *Id.*

In *Home Depot*, the retailer and financier, General Electric Capital Corporation, agreed it would issue Home Depot credit cards to Home Depot customers. The agreement between the financier and Home Depot provided that the financier was the exclusive owner of the credit card accounts and bore the risk of credit losses on the accounts, and that Home Depot had no interest in the accounts or indebtedness of the credit card program the financier had created. The financier made all decisions regarding customer eligibility for the credit cards, and it set the finance charges, fees, and all other terms of the credit card accounts. The financier paid Home Depot bonuses in consideration for the agreements. Home Depot daily transmitted the credit card sales to the financier, which then paid Home Depot the proceeds on the sales, including retail sales taxes, minus charges for service fees. Home Depot deducted the service fees it paid

the financier as a business expense on its federal tax return. The financier took the bad debt deduction under section 166 for defaulted Home Depot accounts on its federal income tax return. Under RCW 82.08.037, Home Depot sought a refund of sales tax that it paid on defaulted transactions made on the credit card that it had contracted with the financier to establish. It argued that a seller is entitled to a sales tax refund for sales taxes previously paid on debts that are deductible by *any* company as worthless for federal income tax purposes so long as the seller/sales tax refund claimant shows that it actually bore the risk of loss from the defaulted debt. *Home Depot*, 151 Wn. App. at 915. DOR denied the refund.

In affirming DOR, the Court of Appeals noted that RCW 82.08.037 required a "seller" to be a person making sales at retail who was entitled to a refund for sales taxes previously paid on debts that are deductible as worthless for federal income tax purposes. *Id.* at 919. It also recognized that a seller could include an original seller's assignee and that an original seller could assign the tax attribute of "making sales at retail" to a financing entity, making it eligible for a sales tax refund. *Id.* It observed that Home Depot sold goods and made sales at retail, but it held that it was not "entitled to a refund for sales taxes previously paid on debts that are deductible as worthless for federal income tax purposes" because that requirement applied only to seller-claimants that incur the deductible debt. *Id.* at 918-19. The court reasoned that Home Depot sold all of its interest in the credit card accounts to the financier, thereby surrendering both its right to deduct losses on the credit card accounts as bad debt and its ability to claim a refund for

10

the defaulted debt. *Id.* at 920. Thus, Home Depot no longer had authority to deduct customer defaults on the cards as bad debt or to seek the sales tax refund. *Id.*

The *Home Depot* court found this holding consistent with other state laws and with federal bad debt statute 26 U.S.C. § 166, which ties the sales tax refund to a valid, existing debt between a seller and a buyer that the seller can no longer collect from the buyer and that is an enforceable obligation arising from a debtor-creditor relationship. *Id.* at 920-21. The court observed that when a buyer purchased an item on a Home Depot card, Home Depot paid the sales tax due to DOR, creating a statutory debt due from the buyer to the seller, Home Depot. But, immediately after the sale, when Home Depot submitted the charge to the financier and the financier reimbursed Home Depot for the purchase price and sales tax payment, the statutory debt between Home Depot and the buyer ceased to exist, and the buyer no longer owed Home Depot anything because the buyer's statutory debt, as well as the underlying debt for the purchase price, was discharged. At that point, Home Depot no longer held any debt that was "directly attributable to its sales tax payment to" DOR. *Id.* at 922.

Importantly, the court noted that Home Depot no longer had any right to collect unpaid sums from the buyer and could not legally seek repayment from the buyer for any loss due to the buyer's later default because Home Depot sold all its rights to the Home Depot card account to the financier, further demonstrating that the statutory sales tax debt was no longer connected to Home Depot. *Id.* The court held that although RCW 82.08.037 did not explicitly require bad debts to be deductible by the refund claimant,

state and federal tax laws demonstrated that "the party seeking the deduction must be the one holding the bad debt as well as the one to whom repayment on such a debt would be made." *Id.* (citing Alabama, Indiana, and Oklahoma cases). Home Depot was promptly paid in full, including sales tax, and was not the party who wrote off the receivable as uncollectible to get a sales tax refund, so its argument failed. *Id.* The court rejected Home Depot's argument that in setting agreed service fees that the financier paid to Home Depot, the parties incorporated the anticipated bad debt expenses into their pricing calculations, and so Home Depot suffered actual loss, because it would allow Home Depot a sales tax refund for an ordinary business expense. *Id.* at 923-24. Simply "because *someone* can deduct the unpaid sales tax as a bad debt does not transform an ordinary business expense or loss into a refundable sales tax debt" under RCW 82.08.037. *Id.* at 924.

Relying on *Home Depot*, DOR, here, argues that Lowe's profit share reductions qualified as bad debt from a guarantor loss under section 1.166-9, but they did not qualify as retail sales or B&O tax bad debt under state law because they did not constitute bad debt directly attributable to the retail sale for "sales taxes previously paid" and "written off as uncollectible." Instead, DOR argues, the guaranteed profit share reduction covered the banks' credit account losses. And once Lowe's collected the taxes from buyers, it held them in trust until paid to DOR, RCW 82.08.050(2), and no authority states that Lowe's could later "negate" the buyer's satisfaction of the sales and B&O tax obligation through an agreement with the banks.

DOR reasons that here, as in *Home Depot*, the banks contracted with Lowe's to provide the credit card accounts; determined the eligibility of cardholders; set the terms, fees, and penalties of the accounts; and exclusively owned and managed the credit card accounts, including account indebtedness and outstanding receivables. And Lowe's sold any right, interest, or title in any payment made by or on behalf of the account holder to the banks, which controlled all account collection. Within days of a credit card purchase, the banks paid Lowe's the full amount of the purchase, including sales and B&O taxes, so that the buyer then ceased to owe Lowe's anything, and Lowe's no longer held any debt "directly attributable" to its B&O or sales tax payments to DOR. Although Lowe's took a bad debt deduction pursuant to section 166 for the amount of the banks' bad debt that it guaranteed relating to the banks' account losses, that debt arose after the banks had paid Lowe's in full for an account purchase, including sales and B&O tax. Thus, the court held that the bad debt Lowe's paid was not "directly attributable" to Lowe's retail sale.

We disagree. First, we note that the language "directly attributable" is nowhere in the statutes or regulations. Even if it that language did appear, there is no doubt that Lowe's was the retail seller, that it remitted sales tax to DOR, and that it was also the guarantor of the unpaid sales tax. DOR argues that Lowe's did recover the sales tax; it was fully paid by the banks, and then remitted to the State by Lowe's. But Lowe's did not receive payment from its buyers who had defaulted, and it was guarantor to the banks

for the unpaid sales tax.[5] A seller making a credit sale to a customer who later defaults in payment will have remitted sales tax to the State that it could not collect from a customer. *Puget Sound Nat'l Bank*, 123 Wn.2d at 287.

Similar to PSNB, which acted as assignee in *Puget Sound National Bank*, Lowe's contracted to act as guarantor for its customers who defaulted on credit payments and thus failed to pay sales tax that was due. As this court observed in *Puget Sound National Bank*, no statute or public policy prohibited the assignment of a sales tax refund. *Id.* at 288-91. The court held that an assignment carries with it the rights and liabilities of the assigned contract and applicable statutory rights and liabilities, so that when the dealers assigned the installment contracts to PSNB, the bank assumed all the dealers' rights and liabilities related to the contracts. *Id.* at 293. Here, no one questions that Lowe's was the seller and that Lowe's assumed the legal liability for losses attributable to its customers who defaulted, including unpaid sales tax. That the bad debt was created in two steps rather than one is of no moment—the policy underpinning the bad debt deduction is to "provide relief to vendors" left holding uncollectible sales tax. *Home Depot*, 151 Wn. App. at 917.

---

[5] The dissent invokes legislative history in the form of introduced but unpassed legislation as undermining the conclusion that Lowe's is not entitled to a deduction. *See* dissent at 18. As the dissent correctly notes, legislation that has not been enacted (let alone passed out of legislative committee) reveals little about the intent of the legislature and should not generally be relied upon. *See, e.g., In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011) ("Our fundamental purpose in construing statutes is to ascertain and carry out the intent of the legislature. We determine the intent of the legislature primarily from the *statutory language*." (emphasis added) (citation omitted)).

As noted, section 166 allows as a deduction "any debt which becomes worthless within the taxable year." And if a taxpayer agrees in the course of its business to guarantee a debt obligation and it makes a "payment of principal or interest . . . in discharge of . . . the taxpayer's obligation as a guarantor," that payment is "treated as a business debt becoming worthless in the taxable year in which the payment is made." 26 C.F.R. § 1.166-9(a). A taxpayer's payment in discharge of its agreement to act as a guarantor of an obligation will be treated as worthless debt only if the agreement was entered into in the course of the taxpayer's trade or business or a transaction for profit, the taxpayer was subject to an enforceable legal duty to make the payment, and the agreement was entered into before the obligation became worthless. 26 C.F.R. § 1.166-9(d). These provisions entitled Lowe's to the sales and B&O tax credits because its payments, in the form of the banks' deductions from its profit share and made pursuant to an agreement executed before the debt became worthless, discharged its legal obligation as a guarantor of the sales and B&O tax bad debt.

We agree with Lowe's that *Home Depot* does not control because there the financier was completely responsible for all its bad debt relating to nonpayment of retail sales tax and never agreed to act as Home Depot's guarantor, while here Lowe's agreed to guarantee a portion of the banks' credit card related bad debt for sales taxes previously paid that were "written off as uncollectible."

WAC 458-20-196 entitles sellers to a refund for sales taxes or B&O taxes previously paid on bad debt under section 166 of the Internal Revenue Code, and ensures

15

that taxpayers may claim the refund "for the tax reporting period in which the bad debt is written off as uncollectible in the taxpayer's books and records and would be eligible for a bad debt deduction for federal income tax purposes." Former WAC 458-20-196(2)(a), (3)(a). Consistent with federal standard section 166, former WAC 458-20-196 merely stated *when* a taxpayer may claim a credit or refund; it did not require a taxpayer seeking a tax refund to have claimed the bad debt as an uncollectible debt on its books, and it did not address a guarantor's payment of a financier's debt obligation. And even if there was a write-off requirement, in recording the amount of the banks' reductions to its profit share, Lowe's met that bad debt write-off requirement.

### B&O tax refund

Lowe's also seeks relief for its B&O taxes pursuant to RCW 82.04.4284(1). Taxpayers pay for the "privilege of engaging in business" in Washington State through B&O taxes. RCW 82.04.220(1). The state B&O tax system "impose[s] the business and occupation tax upon virtually all business activities carried on within the state," *Time Oil Co. v. State*, 79 Wn.2d 143, 146, 483 P.2d 628 (1971), and "leave[s] practically no business and commerce free of . . . tax." *Budget Rent-A-Car of Wash.-Or., Inc. v. Dep't of Revenue*, 81 Wn.2d 171, 175, 500 P.2d 764 (1972). Businesses cannot impose B&O taxes on their customers. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 180-83, 157 P.3d 847 (2007). Instead, the tax is levied directly on businesses and against the value of products, gross proceeds of sales, or gross income of a business. RCW 82.04.220(1). RCW 82.04.4284(1) states, "In computing tax there may be deducted from

the measure of the tax bad debts, as that term is used in 26 U.S.C. Sec. 166, . . . on which tax was previously paid." For B&O taxes on retail sales, the tax applies at the rate of 0.471 percent of "the gross proceeds of sales of the business." RCW 82.04.250(1). A party may deduct "from the measure of tax bad debts, as that term is used in 26 U.S.C. Sec. 166, . . . on which tax was previously paid." RCW 82.04.4284(1).

Lowe's is entitled to a bad debt deduction for B&O tax because, similar to its "sales tax" payments, Lowe's incurred bad debt. Lowe's satisfies RCW 82.04.4284.

## CONCLUSION

Under the circumstances of this case, Lowe's is entitled to a refund for the taxes it paid concerning its customers' bad debt. Lowe's timely paid sales taxes to the State following Lowe's sale of goods to its customers, but some customers defaulted on those credit sales. Via its guarantor arrangement with the banks, which facilitated the credit transactions, Lowe's reimbursed the banks for the losses the banks incurred from the defaulting customers (i.e., the bad debt). While third-party banks were involved as to the credit transactions (i.e., as facilitators of the credit sales), Lowe's is still the seller burdened with the loss for its customers' defaults, including their nonpayment of the sales taxes. Accordingly, we hold that under RCW 82.08.037(1), Lowe's may properly claim a deduction for "sales taxes previously paid on bad debts." Similarly, under RCW 82.04.4284, Lowe's may properly claim a deduction concerning its B&O taxes based on the same bad debt. We reverse the Court of Appeals and remand the case for further proceedings in accord with this opinion.

No. 96383-5

_Madsen, J._

WE CONCUR:

No. 96383-5

WIGGINS, J. (dissenting)—The central issue before us is whether petitioner Lowe's Home Centers LLC is entitled to a refund of sales taxes and business and occupation (B&O) taxes from credit extended by banks to Lowe's customers, who then defaulted. RCW 82.08.037(1); RCW 82.04.4284. Lowe's contracted with two banks to provide private label credit cards (PLCCs). Within two days of a credit purchase, the banks would send full payment and related sales taxes to Lowe's. Lowe's then remitted the sales tax to the Department of Revenue (DOR). To help mitigate the banks' risks of defaulting customers, the banks and Lowe's entered into a profit and loss sharing agreement under which Lowe's profits were reduced to cover a certain percentage of the banks' losses from defaulting customers.

The majority holds that Lowe's may claim a tax deduction under RCW 82.08.037(1) for "sales taxes previously paid on bad debts." It further holds that under RCW 82.04.4284, Lowe's may claim a deduction concerning its B&O taxes for the same alleged bad debts.

The majority would allow Lowe's to contract its way out of paying Washington state taxes—taxes not, in fact, paid by Lowe's but paid by the banks and Lowe's customers. I respectfully dissent because the majority's interpretation allows Lowe's to collect the unpaid sales tax even though Lowe's never loaned Lowe's customers the funds to pay the sales tax, never owned the funds used to pay the sales tax, and never tracked the customer debtors or pursued any collection action against the credit card debtor. It permits Lowe's to reap the benefits of operating in Washington, enjoying the

privileges of a business and the direct commerce with the state's residents, while depriving the State—and therefore those very Washington residents—of the benefit of more tax dollars. The loser here is not just the State but also the people of Washington.

Nothing in the statutory scheme nor the case law permits this result. Just the opposite is what is mandated by our statutes. Lowe's reductions in profit sharing are "not sales taxes previously paid" within the meaning of the statutory scheme, and Lowe's did not incur any bad debt directly attributable to retail sales. I would therefore hold that Lowe's is not entitled to the deductions. Given that, I would also reach the issue of whether the denial of the tax deduction violates equal protection and hold that it does not. I respectfully dissent.

## STATEMENT OF FACTS

The material facts in this case are undisputed. Lowe's and the banks entered into contracts to provide PLCCs to customers. Clerk's Papers (CP) at 452.[1] Only the banks extended the credit and owned and managed the cardholders' accounts. *Id.* at 134, 136, 453. Lowe's had "no right, title or interest in or to any of the foregoing and no right to any payments made by or on behalf of Cardholders on Accounts or any proceeds with respect to the Accounts." *Id.* at 136 (agreement between Lowe's and Monogram Credit Card Bank of Georgia). Further, the banks held the exclusive right to receive payments from cardholders. *Id.*[2] As a result, the cardholders never owed Lowe's any debt.

---

[1] Customers could apply for a Lowe's PLCC, and if the bank granted the application, customers could use the PLCC to purchase merchandise from Lowe's. CP at 133, 136, 453.
[2] Although cardholders could make payments on the accounts at Lowe's retailers, in those situations, Lowe's was acting solely as an agent of the banks. *Id.* at 136.

2

When a customer used a PLCC to purchase merchandise from Lowe's, Lowe's would notify the banks of the total purchase price. *Id.* at 138, 145. The banks would, within two days, pay Lowe's for the merchandise price and any applicable sales taxes. *Id.* at 145, 453. Lowe's would then remit the sales taxes and B&O taxes to DOR. *Id.* at 453.

Things became more complicated when a cardholder defaulted. The PLCC agreements established a process of monthly allocations of revenue and expenses to distribute to the banks and to Lowe's. This fund consisted of program revenues net of program expenses, reduced by net write-offs. The net write-offs consisted of delinquencies from prior credit card sales. Under the PLCC agreements, Lowe's agreed to guarantee payment of delinquent customers' debt. *Id.* at 453-55. All delinquencies were totaled monthly and became net write-offs. Lowe's was then charged a fixed percentage of the net write-offs pursuant to its contractual guaranty to cover a percentage of customer defaults. *Id.* at 442. Lowe's payment was actually charged against Lowe's share of the monthly distribution under the PLCC agreements. In short, under the contracts, Lowe's and the banks agreed to share profits and losses. *See id.* at 140-41, 453-55. Lowe's was entitled to profits above the banks' target rate of return from interest payments, late fees, and other fees associated with cardholder accounts. *Id.* at 141, 454. Further, Lowe's was responsible for the banks' net write-offs across the portfolio up to a cap of approximately 7.0 percent to 7.5 percent of average net receivables depending on the contract. *Id.* at 453. In other words, when cardholders defaulted, Lowe's was responsible for a certain percentage of their default up to the cap. *Id.*

3

The bank retained ownership of all rights, debts, and accounts whether the cardholder defaulted or not. *See id.* at 145 (Lowe's has "no right, title or interest in the Accounts (including the Indebtedness)"). The banks would write off the debt from the defaults as uncollectible. *Id.* at 85, 128. To settle these debts according to the PLCC agreement, the banks would reduce Lowe's profits by the amount of money Lowe's owed for the defaulting customers. *Id.* at 454-55. The defaulting customers were separated by stores, but Lowe's did not determine the individual debtors or whether those debtors paid any of the sales taxes. *Id.* at 433. Lowe's declared these losses on its corporate income tax return. *Id.* at 455.

The contracts also provided that Lowe's retained the right to claim any available sales tax deductions. *Id.* at 144, 454. Accordingly, Lowe's deducted the sales tax bad debts on line 15 of its federal income tax returns. *Id.* at 455. Lowe's also claimed Washington sales tax credits and B&O tax credits. *Id.* at 459.

DOR audited Lowe's bad debt and B&O tax claims, determined Lowe's had improperly claimed the credits, and assessed the PLCC bad debt and B&O taxes. *Id.* at 419, 427, 460. The Appeals Division of DOR affirmed the assessment of the taxes. *See id.* at 432-48.

Lowe's paid its tax assessments and filed a refund claim in superior court for a refund of the tax payments. *Id.* at 5, 450-51. The parties filed cross motions for summary judgment. *Id.* at 1156, 2616. The superior court granted DOR's motion for summary judgment and denied Lowe's motion for summary judgment. *Id.* at 2800-02. Lowe's appealed, and Division Two of the Court of Appeals affirmed. *See Lowe's Home*

4

*Ctrs., LLC v. Dep't of Revenue*, 5 Wn. App. 2d 211, 215, 425 P.3d 959 (2018). Lowe's then appealed to this court and we granted review.

## ANALYSIS

We presume taxes are valid, and the burden is on the taxpayer to prove an assessed tax is incorrect. RCW 82.32.180; *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). "If there is ambiguity in a provision providing an exemption or deduction, the court must strictly construe the provision against the taxpayer." *Avnet, Inc. v. Dep't of Revenue*, 187 Wn.2d 44, 50, 384 P.3d 571 (2016) (plurality opinion). Lowe's cannot meet this burden.

RCW 82.08.037(1) provides that a "seller is entitled to a credit or refund on sales taxes previously paid on bad debts, as that term is used in 26 U.S.C. Sec. 166." A bad debt is "based on federal income tax standards for worthlessness under 26 U.S.C. Sec. 166." WAC 458-20-196(2)(a); *see also* WAC 458-20-196(3)(a) ("The bad debts reported must meet the federal revenue code standards for worthlessness.").[3]

Our state bad debt statute requires that a taxpayer (1) be a seller (2) making sales at retail and (3) entitled to a refund for sales taxes previously paid on bad debts (4) that are federally deductible. RCW 82.08.037(1); *see also* WAC 458-20-196(3)(a). At issue in this case is whether Lowe's meets requirement three and whether meeting requirement four automatically meets requirement three.

---

[3] A deductible bad debt under 26 U.S.C. section 166 must "arise[ ] from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." 26 C.F.R. § 1.166-1(c). Bad debts under 26 U.S.C. section 166 can result from multiple transactions, including guaranty payments. 26 C.F.R. § 1.166-9(a).

I.  Lowe's contractual payments to the banks do not qualify as "sales taxes previously paid" under RCW 82.08.037(1)

To determine if Lowe's meets the third requirement, I examine the meaning of "sales taxes previously paid." RCW 82.08.037(1).

Statutory interpretation is a question of law, which we review de novo. *State v. Budik*, 173 Wn.2d 727, 733, 272 P.3d 816 (2012). The purpose of statutory interpretation is to ascertain and carry out the intent of the legislature. *Id.* We determine the intent of the legislature primarily from the statutory language. *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011).

We start with "'the statute's plain language and ordinary meaning.'" *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003) (quoting *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). To determine the plain meaning, we look to all the legislature has said in the statute and related statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). We assume that the legislature does not intend to create an inconsistency between statutes. *State v. Bash*, 130 Wn.2d 594, 602, 925 P.2d 978 (1996). Statutes are to be read together in order "to achieve a 'harmonious total statutory scheme . . . which maintains the integrity of the respective statutes.'" *State ex rel. Peninsula Neigh. Ass'n v. Dep't of Transp.*, 142 Wn.2d 328, 342, 12 P.3d 134 (2000) (alteration in original) (internal quotation marks omitted) (quoting *Employco Pers. Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991)).

Lowe's argues that its contractual payments constitute "sales taxes previously paid" under the statute because they covered some of the banks' losses that included

6

sales tax funds. Pet. for Review at 13-15; Suppl. Br. of Pet'r at 11-14. The majority agrees without performing any substantive analysis. Majority at 14. I would reject this conclusion because under the statutory scheme Lowe's profit reductions do not constitute sales taxes previously paid.

A. Lowe's fully recovered sales tax from the banks, and its reductions in profits from the bank do not qualify as sales tax

Because "sales tax" is not defined in RCW 82.08.037, we look to the statutory scheme as a whole and related statutes in order to define "sales tax previously paid." RCW 82.08.050 (1) details the protocol for "tax payable in respect to each taxable sale," or sales tax. Under the unambiguous language, this statute detailing sales tax explains that sales tax is collected by a seller from a buyer and that the tax collected is then "deemed to be held in trust by the seller" until it has been used for its sole purpose: paying DOR. RCW 82.08.050(2). This indicates that the legislature intended that sales tax payments can be used only to pay DOR and cannot be used to pay for any other type of debt. Here, after each transaction, Lowe's informed the banks of the purchase price, including sales tax. The banks then paid Lowe's, and Lowe's properly remitted sales tax funds to DOR. These payments constitute the only sales taxes Lowe's has previously paid.

When the banks could not collect funds from defaulting credit card holders, the banks reduced the profits shared with Lowe's subject to the profit and loss sharing agreement. These reductions in Lowe's profits cannot constitute "sales taxes previously paid." As section .050 requires, Lowe's can use sales tax funds only to pay DOR. Lowe's cannot purport to use sales tax funds to pay an obligation to the banks. This is

7

especially true when the monthly reconciliation of defaulting customers did not include an inquiry into whether any individual customers had previously paid some, if not all, of the sales tax on the purchases on which they defaulted. Defaulting customers can fail to pay the purchase price, the sales tax, interest, and other fees. Without an individualized determination of each default, one cannot determine what, if any, sales tax loss Lowe's made up for with the profit sharing. Interpreting the phrase "sales taxes previously paid" within the statute to include Lowe's reduction in profits results in Lowe's receiving a sales tax refund for its payments to third parties for a private debt. This effectively permits Lowe's to characterize private payments as payments of sales tax when, under the statute, sales tax is only that tax deemed held in trust and then remitted to DOR. This cannot be the legislature's intent as it violates section .050 and creates inconsistency in our tax statutes in that it would allow sales taxes to be used for private debts when sales taxes can be used only for paying DOR. *See Bash*, 130 Wn.2d at 602 ("This court assumes that the Legislature did not intend to create an inconsistency in statutes, and seeks to construe statutes so as to avoid inconsistency."); *Peninsula Neigh.*, 142 Wn.2d at 342 (citing the same). The majority fails to reconcile this inconsistency.

Even if we assume Lowe's payments to the banks are not strictly "sales tax" as contemplated by section .050 but, instead, cover the banks' sales tax funds, permitting Lowe's to receive a *sales tax* refund based on these repayments essentially allows a private corporation to transform non-sales-tax funds into sales tax funds by contract. Private agreements cannot disrupt the characterizations of a business's transactions for tax purposes. *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548,

8

556-57, 252 P.3d 885 (2011) (citing *Rho Co. v. Dep't of Revenue*, 113 Wn.2d 561, 782 P.2d 986 (1989)); *see also Ford Motor Co.*, 160 Wn.2d at 43-44 (out-of-state seller could not avoid business and occupation tax by contractually transferring title at the point of shipment).

The majority reasons that "Lowe's did not receive payment from its buyers who had defaulted" and "a seller making a credit sale to a customer who later defaults in payment will have remitted sales tax to the State that it could not collect from a customer." Majority at 14 (citing *Puget Sound Nat'l Bank v. Dep't of Revenue*, 123 Wn.2d 284, 287, 868 P.2d 127 (1994)). But this ignores the fact that Lowe's was never going to receive payment directly from the buyers, even if it did pay back the banks in full, because the banks had already paid Lowe's. After the banks had paid Lowe's in full, there was nothing left for Lowe's to collect, and Lowe's had no ownership or interest in any payments from the cardholders to the banks.

The majority further reasons, "That the bad debt was created in two steps rather than one is of no moment—the policy underpinning the bad debt deduction is to 'provide relief to vendors' left holding uncollectible sales tax." Majority at 14-15 (quoting *Home Depot USA, Inc. v. Dep't of Revenue*, 151 Wn. App. 909, 917, 215 P.3d 222 (2009)). But Lowe's is not a vendor left holding uncollectible sales tax. Lowe's collected all of the sales tax from the banks and remitted the tax to DOR. That Lowe's profits are reduced[4] because of a customer's failure to repay the banks does not mean that Lowe's

---

[4] The majority itself refers to the guarantor payments between Lowe's and the banks as "deductions from [Lowe's] profit share." Majority at 15. This cuts against the majority's own assertion that Lowe's is holding uncollectible sales taxes and supports instead that the banks are holding the uncollectible sales taxes but pays Lowe's less profits if customers default.

9

is "holding an uncollectible sales tax." The banks are holding an uncollectible sales tax in which Lowe's has no interest per the contractual agreement.

Although I would find the statute unambiguous, at best Lowe's and the majority have identified an ambiguity in the sales tax statutory scheme. But an ambiguity is not sufficient to meet the burden of showing that the assessed tax is incorrect. Because any ambiguity is construed against the taxpayer, Lowe's cannot meet the burden, and DOR correctly assessed the tax.

### B. Lowe's did not incur bad debt

Lowe's is not entitled to bad debt relief because under the statutory and regulatory language, Lowe's did not incur bad debt or write it off as uncollectible.

RCW 82.08.037(1) defines "bad debts" "as that term is used in 26 U.S.C. Sec. 166." 26 U.S.C. section 166(a)(1) allows a bad debt deduction for "any debt which becomes worthless within the taxable year." Former WAC 458-20-196(2)(a) (2005) provides, "Taxpayers may claim the credit or refund for the tax reporting period in which the bad debt is written off as uncollectible in the taxpayer's books and records and would be eligible for a bad debt deduction for federal income tax purposes." *See also* RCW 82.08.037(6) ("The department must allow an allocation of bad debts . . . if the books and records of the person claiming bad debts support the allocation.). The plain language of the WAC thus indicates that the taxpayer can receive the refund only in the year that they have written the debt off as uncollectible.

Lowe's did not incur bad debt because it received full payment on credit card purchases from the banks. Lowe's did not write off any debt because Lowe's recorded the purchase price and sales taxes on its books as it did for cash, checks, and other

10

credit card transactions. *See* CP at 60. Lowe's books did not reflect unpaid debt obligations on any credit card accounts because the accounts were managed by the banks. CP at 41, 136, 160.

Rather than incurring bad debt, Lowe's agreed to pay for the *banks'* bad debt and seeks to make up this loss through a state sales tax deduction. This might have been a necessary compromise on Lowe's part in order to make the PLCC program viable. But Lowe's risk mitigation decisions do not allow it to escape the tax consequences of those decisions. *E.g., Wash. Imaging Servs.*, 171 Wn.2d at 556. "The risk that the private label credit card program will be less profitable than anticipated does not qualify as a bad debt." *Sears, Roebuck & Co. v. Roberts*, No. M2014-02567-COA-R3-CV, 2016 WL 2866141, at *6 (Tenn. Ct. App. May 11, 2016) (unpublished), *review denied*, No. M2014-02567-SC-R11-CV (Tenn. Sept. 23, 2016).

The majority contends that because Lowe's is a guarantor its debt is a worthless debt under 26 C.F.R. section 1.166-9(a) and that this is sufficient to meet the requirements for bad debt. Majority at 15. As will be discussed below, meeting the federal requirements is not sufficient to qualify for a deduction in Washington. *See* Part II, *infra*.

The majority also concludes that "written off on the books" is not a requirement but, instead, indicates when the deduction can be taken. This is somewhat true in that it does indicate the year in which the deduction can be taken: the year that the taxpayer has written the debt off as uncollectible. If within the year the taxpayer does not write off the debt as uncollectible, then the taxpayer does not qualify. Further, the majority concludes, but does not explain, that Lowe's meets the write-off requirement. Majority

at 16. As noted, Lowe's does not show that it meets this requirement and cannot meet its burden.

Even if it were ambiguous whether the write-off is a requirement, this ambiguity would be strictly construed against the taxpayer and, thus, is a requirement that Lowe's has not met. Therefore, DOR properly assessed the tax.

### C. Case law supports the conclusion that Lowe's is not entitled to a deduction

Both Lowe's and DOR rely on the only two Washington cases interpreting RCW 82.08.037(1): *Puget Sound* and *Home Depot.* The majority concludes that *Puget Sound* supports Lowe's claim for bad debt relief and that *Home Depot* is materially distinguishable. Majority at 13-15. The majority misreads these cases.

In *Home Depot*, Division Two of the Court of Appeals addressed whether a retailer could obtain a sales tax refund based on losses from a private credit card program. 151 Wn. App. at 912. Home Depot contracted with a bank to finance its private credit cards. *Id.* at 913. The bank was the exclusive owner and bore all the loss on the accounts; Home Depot had no interest in the accounts or any indebtedness created by the program. *Id.* at 914. After close of business each day, Home Depot transmitted credit card sales to the bank. *Id.* The bank would pay Home Depot the proceeds and sales tax, minus service fees that partially covered the bank's losses for uncollectible funds. *Id.* The bank took a federal bad debt deduction for defaulting accounts; Home Depot did not. *Id.* at 913. Home Depot sought a sales tax credit under subsection .037(1), which DOR denied. *Id.* at 914.

On appeal, the court concluded that reimbursement was not warranted. *Id.* at 922. A unanimous panel reasoned that when buyers purchased goods with PLCCs and

Home Depot paid the sales tax to DOR, this created a statutory debt owed by the buyer to the seller. *Id.* at 921. When the bank reimbursed Home Depot for the purchase price and sales tax, buyers no longer owed any debt to Home Depot—thus Home Depot no longer held any debt "directly attributable to its sales tax payment to DOR." *Id.* at 922. The court specifically recognized that federal and state tax law demonstrate that the party seeking a deduction must be the one holding the bad debt as well as the one to whom repayment on the debt would be made. *Id.* (citing cases from multiple jurisdictions in support). Furthermore, contrary to Home Depot's assertion that it "actually bore the loss for the defaulted debts" based on service fee payments to the bank, the court held that these payments constituted ordinary business expenses that can never constitute bad debt. *Id.* at 923-24 (citing *Spring City Foundry Co. v. Comm'r*, 292 U.S. 182, 189, 54 S. Ct. 644, 78 L. Ed. 1200 (1934); RCW 82.08.010(1) (excluding overhead and other costs of doing business from sales tax calculations)).

While not identical, the facts of *Home Depot* are remarkably similar to the present case, and any differences in the present case are minor and fail to distinguish it from *Home Depot*. Both cases involve third-party lenders financing a retailer's private credit card program. The retailers do not own, manage, or have any interest in the accounts, and the third-party lenders bore all loss from the accounts. Despite Lowe's claim that its contractual repayments are distinct from Home Depot's service fees, the nature of the transactions are the same for sales tax purposes. Home Depot and Lowe's both claimed their respective payments demonstrated that they bore losses on bad debt, but neither's payments covered debt because neither retailer incurred debt—in both cases the banks incurred the debt and were the sole parties who could collect from the

13

customers. There was no continuing sales tax debt between Lowe's or Home Depot and its customers. Both Lowe's and Home Depot properly paid DOR the full amount of sales tax funds; thus no debt existed for either retailer. The only continuing debt concerned the customers and the banks. Lowe's contractual guaranty of the banks' debt does not transfer that debt to Lowe's for sales tax relief. *Wash. Imaging Servs.*, 171 Wn.2d at 556-57 (private agreements cannot disrupt the proper characterizations of its transactions for tax purposes).

In addition, though *Home Depot* did not concern contractual guaranty payments, the tax consequence of Lowe's guaranties is the same as *Home Depot*'s service fees: the funds constitute the costs of business to run the private credit card program. They were not "sales taxes" or payments for bad debt. RCW 82.08.010(1) (excluding costs of doing business from sales tax calculations). Lowe's contractual payments and Home Depot's service fees thus constitute ordinary business expenses, which cannot be included for sales tax calculations. I would hold Lowe's does not qualify for the deduction.

The majority concludes that *Home Depot* does not control because "the financier was completely responsible for all its bad debt relating to nonpayment of retail sales tax and never agreed to act as Home Depot's guarantor, while Lowe's agreed to guarantee a portion of the banks' credit card related bad debt for sales taxes previously paid." Majority at 15. This brief discussion[5] oversimplifies *Home Depot* and attempts

---

[5] Although the majority dedicates over three pages to discussing the *Home Depot* opinion and another page to DOR's arguments in relation to *Home Depot*, it concludes the case does not control with little substantive explanation as to why beyond the above-quoted text. *See* majority at 9-15.

14

to distinguish the case when the distinguishable facts are not material to the resolution of the present case, as discussed above.

The majority further takes issue with the "'directly attributable' to its B&O or sales tax payments to DOR" language in *Home Depot*, as it is "nowhere in the statutes or regulations." Majority at 13.

Although the words do not appear in the statutory scheme, the Court of Appeals appropriately used "directly attributable" to limit the sales tax refund. The "directly attributable" language provides a helpful test to determine whether debts and payments should qualify under the statutory scheme. As the majority emphasizes, the policy surrounding the deduction is to provide relief to a vendor holding uncollectible sales tax. Majority at 14-15. The "directly attributable" language provides a framework for the trial courts to determine whether the vendor, or another, is holding uncollectible sales tax. If the debt is not directly attributable to the sales tax payments to DOR, then the party is not holding the debt. Here, the debt cannot be directly attributable to the sales tax payments to DOR because that tax has already been paid and remitted in full. The debt at issue is contractual as part of the profit sharing agreement, and the banks—not Lowe's—are holding the uncollectible sales taxes.

Where *Home Depot* is persuasive in the present case, *Puget Sound* presents a completely distinguishable factual scenario and, thus, an unpersuasive analysis. In *Puget Sound*, we addressed whether a contract assignee could receive a bad debt reduction as a "seller." 123 Wn.2d at 287. A car dealership financed customer car purchases through installment contracts. *Id.* at 285-86. When a contract was signed, the dealer paid the full amount of the sales tax due for the car. *Id.* at 285. Puget Sound

15

National Bank (PSNB) bought these contracts, including the balance of uncollected sales tax. *Id.* at 286. PSNB wrote off the loss on its books for defaulting customers, and applied for sales tax relief; DOR denied the claim. *Id.* at 285-86. On appeal, the parties disputed whether PSNB, as a contract assignee, constituted a "seller" under RCW 82.08.037. *Id.* at 287. We recognized that a "seller" is a person making sales at retail, including an assignee. *Id.* at 288-89. Because the car dealer assigned all its rights and liabilities for the contracts to PSNB, PSNB stepped into the seller's shoes and its status therefore included that of "making sales at retail." *Id.* at 293. Thus, PSNB was entitled to a sales tax refund. *Id.*

The present case is distinguishable from *Puget Sound* because a guaranty is materially distinguishable from an assignment and, as noted above, Lowe's did not pay sales tax to the banks such that it is entitled to a sales tax credit. In *Puget Sound*, we noted that when the car dealer assigned its customers' installments contracts to PSNB, PSNB took on the car dealer's tax rights and liabilities. 123 Wn.2d at 292-93. In effect, PSNB *became* the car dealer, which included the dealer's right to bad debt relief. *Id.* at 293. Here, the banks owned and managed the PLCC accounts; Lowe's had no "right, title or interest" in them. CP at 136. Unlike *Puget Sound*, Lowe's did *not* step into the banks' shoes by repaying the banks because the banks did not assign their tax benefits and liabilities to Lowe's. Nor could the banks assign Lowe's the right to claim bad debt relief because the banks were not the original seller under subsection .037(1)—again, unlike *Puget Sound*. Furthermore, the *Puget Sound* car dealer (and eventually PSNB) was out of pocket when it could not collect sales tax from defaulting customers. 123 Wn.2d at 285-86. Lowe's, however, received from the banks and remitted to DOR the

16

full amount of sales tax. Thus, Lowe's was not out of pocket when credit card holders defaulted—the banks were. Lowe's contracted to be almost immediately reimbursed by the banks for the sales, unlike PSNB, which had to accept the uncollectible debt it owned because it stepped into the car dealer's shoes.[6]

In contrast, the majority incorrectly concludes that similar to PSNB, which paid the balance of uncollectible tax by buying customer installment contracts, Lowe's also paid for uncollected sales tax by guaranteeing the banks' losses (which included uncollectible sales tax). Majority at 14. Thus, the majority concludes that when the banks deducted from Lowe's profit share, Lowe's discharged its obligation as guarantor and was entitled to a tax credit for the profit reduction. *Id.* at 15. But this ignores that Lowe's cannot have paid sales tax to the banks, that Lowe's had no interest in the payments from the cardholders, and the material distinction between a guaranty and an assignment, as indicated above.

---

[6] Lowe's repeatedly emphasizes that its contractual bad debt guaranties made it subject to recourse to the banks for defaulting accounts. Suppl. Br. of Pet'r at 11. Lowe's argues the statement that it received the full purchase price and sales tax from the banks is "false"; in reality, Lowe's contends, it "'paid sales taxes [it] could not collect from the buyer.'" *Id.* at 11-12 (alteration in original) (quoting CP at 2668). For the reasons discussed above, this argument fails.

D. Legislative history also undermines the majority's conclusion that Lowe's
is not entitled to the deduction

Legislative history discloses that Washington lawmakers appear to agree that

RCW 82.08.037 does not allow retailers like Lowe's to receive sales tax reimbursement

for bad debt incurred by third parties. In 2017, a bipartisan group of legislators

introduced a bill recognizing that

> [u]nder current law, if a customer who uses a credit card owned by the
> retailer fails to pay their bill, the retailer is entitled to a credit or refund of
> the sales tax. However, if that same customer uses a private label credit
> card, *neither the retailer nor the private label credit card company is
> entitled to a credit or refund of the tax.*

S.B. 5910, at § 1(3), 65th Leg., Reg. Sess. (Wash. 2017) (emphasis added). The

proposed legislation would have altered section .037 to allow sellers to claim a sales

tax deduction for "tax previously reported by the seller on the unpaid balance due on

the accounts or receivables that are charged off as bad debt on the books and records

of the lender." *Id.* § 2(8)(a). The fiscal note attached to S.B. 5910 echoed the bill's

language, noting that "[u]npaid charges made with private label credit cards . . . are

currently not entitled to a bad debt reduction." Agency Fiscal Note to S.B. 5910, 65th

Leg., Reg. Sess. (Wash. 2017) (prepared by DOR).[7] S.B. 5910 was not enacted by our

legislature. Unpassed legislation reveals little about legislative intent, but it does

indicate that some lawmakers have acknowledged that current law precludes Lowe's

from bad debt relief and have sought to change the law.

---

[7] Passage of S.B. 5910 would have affected about 250 taxpayers and resulted in state revenue
losses of $8.4 million in fiscal year 2018 and $9.6 million in fiscal year 2019. Agency Fiscal
Note to S.B. 5910, *supra*, at 2-3.

II.   RCW 82.08.037(1) requires more than a federal bad debt deduction

Lowe's asserts, and the majority appears to agree,[8] that if Lowe's qualified for a federal deduction, it automatically meets state requirements for a deduction. Majority at 7 (citing Pet. for Review at 3, 11-12; Suppl. Br. of Pet'r at 3). I disagree with this interpretation of the statute.

This conclusion ignores the plain language of our State's bad debt provisions. In RCW 82.08.037(1), federal law is invoked in relation to bad debt "as *that term* is used in 26. U.S.C. Sec. 166." (Emphasis added.) The phrase "that term" is specific. It modifies only "bad debt" and does not modify any other words in the statute. WAC 458-20-196(2)(a)'s reference to federal income tax standards is similarly limited: that our State's bad debt provisions are "based on federal . . . standards" is descriptive. Federal deductibility is required, but it does not supplant subsection .037(1)'s additional requirement that a seller must also pay "sales tax."

RCW 82.08.037(1) and WAC 458-20-196 plainly require more than a federal deduction. As the State succinctly put it, "a federally-qualified bad debt is a necessary but not sufficient condition" for Washington sales tax relief. DOR's Suppl. Br. at 14. Thus, I would hold that Lowe's is not entitled to state bad debt relief based on its federal deduction alone.

---

[8] Although the majority refers to Lowe's assertion in the previous sentence when stating that a federal deduction automatically meets state requirements, the opinion appears to conclude in a roundabout way that because Lowe's meets the federal deduction under 26 C.F.R. § 1.166-9(a) and (d), it meets the requirements of Washington's bad debt statutes. *See* majority at 7 ("Therefore, . . . a federal deduction automatically meets state requirements."), 15 (concluding that under 26 C.F.R. § 1.166-9(a) and (d), not the state statutory scheme, Lowe's is entitled to the deductions). This is incorrect because, as discussed in this section, a federal deduction is only one of the requirements and does not automatically entitle a taxpayer to a state deduction.

19

III. <u>Lowe's similarly does not qualify for a B&O tax refund because it did not incur bad debt</u>

Lowe's also seeks relief for its B&O taxes pursuant to RCW 82.04.4284(1). Lowe's does not distinguish its argument between RCW 82.08.037 (sales tax) and RCW 82.04.4284 (B&O tax) for bad debt purposes. *See* Pet. for Review at 1 n.3 (referring to RCW 82.08.037 and RCW 82.04.4284 collectively as the "Bad Debt Statutes"). For the same reasons that I would hold Lowe's does not qualify for a sales tax deduction, I would hold that Lowe's does not qualify for a B&O tax deduction.

"Upon every person engaging within this state in the business of making sales at retail . . . the amount of tax with respect to such business is equal to the gross proceeds of sales of the business, multiplied by the rate of 0.471 percent." RCW 82.04.250(1). RCW 82.04.4284(1) further indicates that "[i]n computing [the B&O] tax there may be deducted from the measure of tax bad debts, as that term is used in 26 U.S.C. Sec. 166, . . . on which tax was previously paid."

Lowe's is not entitled to a bad debt deduction for B&O tax because, similar to its "sales tax" payments, Lowe's did not incur bad debt. It paid B&O taxes on sale proceeds it received. DOR's Suppl. Br. at 19. As with sales taxes, the banks—not Lowe's—held the bad debt for which a deduction would be warranted. Thus, I would hold that Lowe's does not satisfy section .4284.

IV. <u>Denying Lowe's sales tax deduction does not violate equal protection</u>

Having disposed with the statutory arguments, I would also reach Lowe's final claim that denying it bad debt relief violates equal protection. I would hold that it does not. We review constitutional issues de novo. *State v. Gresham*, 173 Wn.2d 405, 419,

20

269 P.3d 207 (2012) (citing *Optimer Int'l, Inc. v. RP Bellevue, LLC*, 170 Wn.2d 768, 771, 246 P.3d 785 (2011)). The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. The Washington State Constitution provides that "[n]o law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12.

A state tax law does not violate equal protection if there is a rational and legitimate basis for the tax classification. *Williams v. Vermont*, 472 U.S. 14, 23, 105 S. Ct. 2465, 86 L. Ed. 2d 11 (1985). The tax classification does not violate due process unless it is "'arbitrary and irrational.'" *United States v. Carlton*, 512 U.S. 26, 30, 114 S. Ct. 2018, 129 L. Ed. 2d 22 (1994) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984)). It does not violate article I, section 12 of the state constitution if "any state of facts can reasonably be conceived that would sustain the classification." *United Parcel Serv., Inc. v. Dep't of Revenue*, 102 Wn.2d 355, 368-69, 687 P.2d 186 (1984) ("The Legislature has broad discretion in making classifications for purposes of taxation."); *see also* WASH. CONST. art. I, § 12.

Lowe's argues that as a guarantor of the banks' debt, it falls within the class of retailers for whom bad debt relief is available. Pet. for Review at 20. But Lowe's is not in the same class as retailers entitled to claim bad debt relief because, as discussed, Lowe's payments to the banks are not sales tax under subsection .037(1), nor did Lowe's incur bad debt.

21

## CONCLUSION

Lowe's is not entitled to bad debt relief for two reasons: it was not left paying sales tax funds it could not recover and it incurred no bad debt. RCW 82.08.037(1). Lowe's and the banks constructed their PLCC program so that the sales tax obligation was fully satisfied when the banks paid Lowe's, and Lowe's remitted sales tax to DOR. Lowe's did not pay sales tax it could not recover—the banks supplied the tax funds, and the banks attempted to recover those funds from credit card holders, some of whom defaulted. That Lowe's contracted to reimburse the banks for some of that loss does not reanimate Lowe's discharged sales tax obligation. Lowe's was not out of pocket due to sales tax it was required to pay to the State; Lowe's elected to put itself at risk of loss by contracting with the banks to repay uncollectible debt. But Lowe's cannot retroactively incur bad debt or transform its payments into sales tax by contract. Lowe's does not meet the requirements for reimbursement under RCW 82.08.037(1) or RCW 82.04.4284. I would affirm the Court of Appeals and therefore respectfully dissent.

_Wiggins, J._

_González, J._

_Fairhurst, C.J.P.T._

_Yu, J._